Filed 8/26/24  P. v. Vasquez CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B315843 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA077627) |
| v. | |
| MAURICE VASQUEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Daviann L. Mitchell, Judge.  Affirmed in part and reversed in part.

Johanna Pirko, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan S. Pithey, Assistant Attorney General, Idan Ivri, Theresa A. Patterson, and Gabriel Bradley, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Maurice Vasquez appeals from his judgment of conviction for count 1, conspiracy to commit murder (Pen. Code,[1] §§ 187, subd. (a), 182), and count 2, first degree attempted murder (§§ 187, subd. (a), 664). The jury also found true each count was committed to benefit, promote, further, and assist a criminal street gang (§ 186.22, subd. (b)(1)(C)) and the offenses were committed within a state prison (§ 1170.1, subd. (c)).

Vasquez makes various challenges to his conviction, claiming evidentiary error and prosecutorial misconduct. However, many of Vasquez's claims are forfeited as his trial counsel failed to object on the grounds he raises on appeal. Nevertheless, we consider the merits of Vasquez's claims as he also argues his trial counsel was ineffective for failing to object to the purported evidentiary errors and instances of prosecutorial misconduct, as well as cumulative error. In reaching the merits of his claims, we conclude Vasquez's arguments are either not persuasive or constitute harmless error. Accordingly, we also reject Vasquez's claims of ineffective assistance of counsel and cumulative error.

Additionally, Vasquez argues the gang enhancement must be reversed because the evidence was insufficient to meet the new requirements under Assembly Bill No. 333 (2021–2022 Reg. Sess.) (AB 333). While we agree with Vasquez the enhancement must be reversed, the prosecution must be given the opportunity to retry those allegations on remand.

---

[1] All further undesignated statutory references are to the Penal Code.

For these reasons, we affirm in part and reverse in part the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Prosecution evidence

#### A. The Northern Riders

Vasquez is the founder and leader of the Northern Riders, a street gang that primarily operates within the California Department of Corrections and Rehabilitation's (CDCR) sensitive needs yards (SNY's). "Northern" has since been dropped from the gang's name, and they are now known as "Riders." Vasquez founded the Riders in an effort to break off from the Nuestra Familia, a prison gang that controls all Hispanic street gangs in Northern California. Vasquez no longer wanted to abide by the Nuestra Familia's rules and regulations, and "went to war" with Nuestra Familia in December 2000.

As a result of this defection, CDCR placed Vasquez and the Riders in protective custody on CDCR's SNY's. While SNY's are intended for inmates who request protective custody and are no longer gang members, SNY gangs, like the Riders, eventually form on the SNY's.

At the time of trial, there were approximately 300 to 400 Riders in custody, and approximately 1,000 to 2,000 Riders in the streets. The Riders' primary activities include pimping, burglary, robbery, extortion, assault, and battery. They have adopted the Playboy bunny as their symbol, and identify themselves using the terms "Compa," "Compadre," "Riders," and "Rider." They refer to the gang as the "Company."

The Riders have a system of progressive discipline, meaning "depending on the infraction the discipline could be lesser or worse." For example, "if a member of the . . . Riders

3

incurred a drug debt, he could just potential[ly] be talked to by one of the older members o[f] the gang or senior members of the gang and be told to repay that debt. If he fails to do so, he can [be] ordered to pay double. If he fails to do that, he could have his property sold to pay his debt. If he continues to incur the debt[,] he could be assaulted by one or more members of the gang. [¶] And if the infraction was something . . . completely worse than that—for instance, a disrespect towards gang leadership—you can be potentially assaulted with weapons."

Vasquez is known as the "Playboy President," "Mac," and "Bad Ass Snoop." If Riders on a particular facility cannot come to a decision between themselves with respect to important gang-related businesses, they will send a message to Vasquez, who has "the ultimate say" in that decision.

### B.     Alexander Diaz

Alexander "Scrappy" Diaz is a former Rider who had a falling out with Vasquez after he led an unauthorized attack on a rival gang without Vasquez's consent. Diaz then formed the Nuestra Cosas, a splinter faction made up of former Riders. The Nuestra Cosas have since become one of the Riders' primary rivals.

### C.     Investigator Luis Chavez

Investigator Luis Chavez testified as the prosecution's primary gang expert. He investigated the Riders for five years and interviewed numerous active and inactive members of the gang.

Chavez explained the Riders' system of progressive discipline. He explained how a gang benefits from using a violent disciplinary system because it conveys to other inmates and members that anyone who "cross[es] this gang" will face violent

repercussions. He opined that forming a splinter faction was one of the most serious violations of the gang's rules, and would warrant the most serious punishment from the gang, such as an assault with weapons or murder. Chavez further opined that murder would be the only way to conclusively deal with a splinter faction. Chavez explained that merely assaulting a member of a splinter faction would result in that individual being moved to another facility where he could potentially continue to recruit members of the original gang. In other words, "the only way to completely remove them . . . would be to kill them."

Chavez testified regarding a document found in Vasquez's cell, titled the "Compadre Concepts and Objectives" (CCO's). Chavez explained that the CCO's are considered the Riders' bylaws. The CCO's state that if a member's "contrary actions persist, a vote will be made [by] . . . committee to serve this individual with an eviction notice out of [the Rider] movement by whatever means the committee deems necessary." Chavez opined this meant Riders may expel a member by any means necessary, including murder.

### D.      Terry Gonzales, Jr.

Terry Gonzales, Jr., was a former Rider and testified as a gang expert for the prosecution. Gonzales became a Rider in 2003, and trained other members about the gang's ideology. He also taught members how to attack other inmates, including how to kill someone quickly by targeting the vital areas of the body, such as the heart, jugular, and carotid artery.

Gonzales knew Diaz started the Nuestra Cosas after a falling out with Vasquez related to an unauthorized attack Diaz carried out against rival gang members. In 2014, Diaz's name appeared on lists published by Vasquez that contained the names

5

of the Riders' enemies. Gonzales admitted he twice targeted Diaz for murder.

Gonzales left the Riders in 2017. In 2020, two inmates attacked Gonzales, stabbing him 25 times on nearly every part of his body. Gonzales suspected Vasquez ordered the attack because one of the attackers yelled out, " 'Riders, Mother Fucker. Riders, Mother Fucker.' " Gonzales later heard the two inmates discussing how they carried out the attack on behalf of Vasquez. Approximately a week or two after the attack, Gonzales and Vasquez were housed in nearby cells. Vasquez told Gonzales that he wanted Gonzales killed because Gonzales was "disloyal in [his] failure to kill Alexander Diaz," and because Gonzales was a "snitch."

### E. Documentary evidence

In August 2018, an investigator found various documents related to the Riders in Vasquez's cell.

#### 1. The Missive

One document was titled, "A Missive Concerning Current [E]xisting Issues On The Compounds," and signed "[L]oyally Committed To The Prosperity Of The Rider Movement, 'The Playboy President.' " It contained the following excerpts:

"There will never be a divide within the RIDER movement. We have a zero tolerance policy towards actions concerning subsets, subgroups or offsets of our movement. Recently in K.S.V.P. there was some nonsense transpiring where compas were identifying themselves as FAS, going as far as tattooing it on them. I sent a personal emphasis to them to cease such controversial behavior and provide one warning for them to cover any tattoos of that crap or it would be fucken cut off of them. The compas delivering the warning were committed to executing

6

extreme violence upon any individual who chose to disregard the compadre[']s commands to terminate such contradictory behavior. The compas who were involved in the shenanigans all immediately obliged. We shall never condone, tolerate, accept, nor support contrary behavior."

"If any entity puts us in a position where we feel challenged, we declare war, plan, prepare and execute the attack wherein we will slaughter our target. That's the Rider way of warfare."

### 2. The Epistle

Another document dated December 31, 2016, was titled "An Epistle Pertaining To The Prosperity of The R.I.D.E.R. Movement." The document was signed by Vasquez as " 'The Playboy President.' " It contained the following excerpts:

"The infestation of imposters running around like a bunch of lowlife, lawless hooligans were practicing and promoting false propaganda. They were convincing the imposters to believe—to believe we're the Northern Riders. Yet, [were] just some made-up gibberish that was falsely fabricated and filtered by [the] lawless little homosexual snitch named Alexander Diaz. . . . [¶] . . . [¶] — who also goes by the several aliases such as Scrappy Diaz, Tiny, Shorty, and Midget. The little jailhouse schmuck first came to CDC in 2011 from CYA and was in Tehachapi in IYP . . . until he turned 18 and was sent to CDC's first SNY in Mule Creek in 2001. [¶] He paroled in 2003, and shortly after was charged with murder of a 15-year-old kid wherein he testified against all his co-defendants from Varrio Meadow Fair in San Jose. [¶] The little faggot has never stepped foot on the mainline and has absolutely nothing to do with founding the Rider movement. What he is responsible for, however, is promoting contradictory behavior

7

under the shield . . . [¶] . . . [¶] —of the glorious Rider movement. He is responsible for all the contrary conduct that was occurring in the PC yards from 2001–2003. While the certified compadres were on the mainlines of [Pleasant Valley State Prison] . . . a yard, Susanville-Lassen yard, Corcoran 3B, and HDSP . . . D yard. [¶] . . . [¶] Guarding and protecting our territory at the time."

"Now mind you, the reason for CDCR's attempt to validate the Rider movement as a prison gang was not . . . as a result of what [Vasquez] and his playboys were doing in 2004, but due to the secret code word . . . . [¶] . . . [¶] Malicious malarkey that faggot Scrappy and her homosexual homegirls were doing on the PC yards. Safe out of . . . harm's way. The first and only time [Vasquez] ever encountered this little prison punk was in Ad Seg law library wherein he instructed . . . [Diaz] to sign off his SNY chrono so he could transfer to High Desert."

"Also, there is no such thing as Team Snoop, Team S[c]rappy. That's some childish nonsense that little faggot snitch [Sc]rappy made up cause he thinks it sounds cute. There is nothing cute nor funny about THE RIDER MOVEMENT! Anyone who arrives to any Playboy Compound via S.V.S.P. D-Yard claiming to be a Compa yet did not leave that yard by way of acts of loyalty, must be dealt with in accordance with RIDER Protocol immediately. There are no exceptions, no explanations, no benefit of the doubt for any of those lames. They all know they are lawless fugitives with warrants for their arrest. There have been executions of justice at extreme capacity performed by righteous RIDERS who have landed there, thus those coward infiltrators know that they are not being victimized for no apparent reason."

8

"That little queer Scrappy went to Tehachapi where he infiltrated as a buster and got his dumb-ass validated as a structure associate which is why he had to debrief in the THU in KVSP. [¶] . . . [¶] Unbeknownst to [Vasquez], he was never going to finally pulverize this little pussy as he has been eagerly anticipating due to Scrappy having his 812. [¶] . . . [¶] [Vasquez] was made aware of this while in KVSP Ad Seg for demolishing some pcs on D yard with some of his compadres.  The reason I'm even elaborating on this . . . is due it to being essentially to defining a . . . line of clarification by emphasizing that anyone who has been . . . deceived to believe this little rat was in any way whatsoever involved in any of what transpired during the tremendous tenacity it took to conquer and surmount the arduous obstacles that were constantly encountered during the introduction of the Rider movement to the prison system. You have your calculation profoundly miscalculated."

### 3.    The "hit list"

A list containing names of individuals and their CDCR identification numbers was also found in Vasquez's cell in August 2018.  Next to each name there was a notation "NC," which Chavez opined was short for Nuestra Cosas.  As such, Chavez opined that the document was a "a list of inmates who are targeted for assault or murder at the direction of the . . . Rider leadership."  Gonzales recognized many of the names on the list and agreed with Chavez's testimony that the list was a Riders' "hit list."  He added that the list was formatted in a manner approved by Vasquez.

### F.    The conspiracy to murder Diaz

On January 17, 2019, Vasquez and Diaz were housed in adjacent cells in the Lancaster prison.

9

On April 2, 2019, Diaz was moved to Facility 3B of California State Prison, Corcoran (Corcoran). Christopher "Blanco" Potter, a Rider with a close "father-son" relationship with Vasquez was also housed at Corcoran at the time.

On April 10, 2019, Potter called Michelle Bravo, who was Vasquez's "secretary." In gang culture, a secretary is someone who aids gang members communicate with each other when they are unable to communicate directly. The conversation proceeded as follows:

"Potter: Alright. I'm good. Have you talked to Maurice?

"Bravo: I'm waiting on his call . . . it should be kinda [*sic*] between now and the week.

"Potter: Ok. And you got everything that I told you last time down?

"Bravo: Yeah. Yeah I did. S[o] um, do you have any word on [Diaz]?

"Potter: He's right here.

"Bravo: Okay, so what's goin [*sic*] on with that?

"Potter: That's what I need to know. Ok. Listen, I got a one-time and that's how I got your number so all that got squashed. It's all good for him from what I know. That's why I've been waiting. You know what I'm saying? [¶] . . . [¶] So, whoever, so, but it's, that's all squashed. It's a stand down. And uh, he's right here. He's on orientation. He came with a couple things for me. That's, you know what I'm saying?

"Bravo: Yeah. So it's proved then?

"Potter: Huh?

"Bravo: It's been proven? It's been proven then that he's . . . .

"Potter:  Absolutely.  I know, I know, I know his writing.  Right?  Maurice?  I know his writing.  And it's his.  It even had something in there for me.  Had this number.  Every other, every other thing that I had.  Yeah, and it's . . . .  And, a lot of other people were like 'Ok' but I had to tell them that's it.  That he did that.  That's it.  There's no . . . you can't, you can't, there's nothing else you can do about it, you know what I'm saying?

"Bravo:  Ok.  So is everybody getting on board with that?  Because I spoke to . . . .

"Potter:  It doesn't matter.  That doesn't matter though.  That doesn't matter.  He did that.

"Bravo:  No, I mean, do they know?  Do they know?  Because he's asking if they know?

"Potter:  Right here?  Right here?

"Bravo:  Yeah.

"Potter:  Everybody, a couple of people at first like ehhh . . . but everybody's on board, and uh, it's alright.  Everything's good.  You know what I'm saying?  There isn't really, there isn't really nothing that nobody can say.  Because when he said he had something for . . . when he said . . . from him.  I said let me see it?  And I already knew the writing.  And it's like . . . and then it had something for me in there.  And that's . . . you know what I'm saying?"

Chavez interpreted the recorded call.  He opined Potter was telling Bravo that Diaz had been "no good" at some point, but was now okay to be on the Corcoran SNY with other Riders because Diaz possessed an inmate-authored note, which identified him to Potter as being in good standing with the Riders.  In a recorded interview, Vasquez explained that, when a Rider is "no good," the

11

gang will issue a "warrant for his arrest," which meant that individual would be beaten "or worse."

On April 16, 2019, Joshua "Primo" Simmons sent Bravo a text message stating, "Good afternoon. This is Primo. At your earliest convenience, can get at me. Thank you." At the time, Simmons was a member of the Riders and was on parole.

On April 17, 2019, Simmons sent Bravo a text message stating, "Hey. I just talked to Charlie. There's no way Scrappy is good. Look, don't give any input to Blanco until you talk to Mac. Something is not right." Bravo replied, "Okay. I understand. I think I know what's going on. Everything will work out fine."

On May 8, 2019, Vasquez called Bravo from Lancaster State Prison. During the call, Bravo informed Vasquez she had spoken to Simmons and Potter. She told Vasquez that Simmons had told her he was "really upset about saying like Alex is good." Bravo also said she had spoken to Potter, who confirmed he had received a note from Diaz. Bravo told Vasquez, "Everybody is kinda upset because I'm like [Diaz] is good, [Diaz] is saying he is good. [¶] . . . [¶] And so is [Potter]. [Potter] is saying yeah, he said I'm here on the yard with him right now, he's with me, it's good." Vasquez responded, "No, not at all. [¶] . . . [¶] Tell them that they need to understand to disregard that, disregard that. Tell them if it's not coming from me directly, disregard that. Tell them what the fuck are they thinking?"

Vasquez then asked Bravo to call Potter's secretary, Abigail "Chula" Valencia while he remained on the phone. Vasquez told Valencia to tell Potter that Diaz would never be "ok," that Diaz had a "stay away order," and that Diaz could not be on the same property as the other Riders at Corcoran.

12

Vasquez then asked Bravo to call Simmons, who was added to the call.  Vasquez relayed a similar message to Simmons that Diaz was not "allowed to be stepping on the . . . property . . . ."  Simmons replied, "I already know that ok but I was told something different ok."  The following exchange then took place.

"Vasquez:  I know but listen to me.

"Simmons:  Wait a second.

"Vasquez:  Ok listen never, never, never, never.  Listen you know Blanco's dad right?

"Simmons:  Right.

"Vasquez:  Blanco's pops, you know Blanco's pops?  Blanco's pops?

"Simmons:  Yeah.

"Vasquez:  Ok Blanco's pops said to disregard everything that that [h]o is talking about.  That bitch can't be over there working at the club bruh.  Aren't mother fuckers smarter than that?  That bitch can't go over there with no recommendation to work at the club nigga.  That's all game that was all game playboy.  Mother fuckers are out of their minds.  Don't they realize that that was all game nigga?  You got to be kidding me.  That bitch can't work there.  Every nigga, listen to me that club will, listen to me this is very important that club will lose their license if that bitch is anywhere on that property bruh.

"Simmons:  I'm already knowing.  I'm already knowing.  I'll take care of it.

"Vasquez:  You know what's crazy?

"Simmons:  I'll make sure it's taken care of by the end of.

"Vasquez:  Ok look it.

"Bravo:  It'll be taken care of.

"Vasquez: In the thing, in that book listen to me nigga in that book it says that her circumstances are still the same. Her circumstances have not changed nigga. Mother fuckers got to get their shit together, niggas are out of their fuckin mind playboy, [they're] out of their mind."

On May 9, 2019, there was a three-way phone call between Vasquez, Bravo, and Simmons. During the call Vasquez recognized Simmons as a certified Rider and told him, "I know exactly who you are Playboy. You certified. You're reputable. These niggas had to step up their fucking game up, man. What are they thinking? What are they thinking? They're allowing that bitch to work at the club on the same property. Them niggas going to all get their license revoked. Are they serious? Are they serious?" Bravo then said, "The son was shining really bright with a note."

That same day, Potter called Valencia. Valencia told Potter she had spoken to Vasquez, who said that Diaz could not "be on the same property" as Potter.

On May 9, 2019, Bravo sent a text message to Simmons stating: "This book is a real thriller, but it looks like what I predicted about the next chapter was right on. That girl is in the perfect place to get a hug and finally be at peace." Simmons replied, "Off top, the question is does someone have the balls to give her a hug?" Bravo then wrote, "We shall see." Simmons replied, "Yes, ma'am."

Chavez opined Bravo and Simmons were speaking in code, and that "finally be at peace" meant someone who was dead.

### G. The attack on Diaz

On the morning of May 10, 2019, Correctional Officer Jose Garcia, Jr., witnessed two inmates fighting on the yard at

14

Corcoran. He radioed and advised officers "to put the yard down due to the fight." The two combatants complied with the orders and got down on the ground.

As Officer Garcia approached the two combatants, he saw Diaz fighting with Guillermo Cordero, a Rider. He saw the men strike each other with closed fists, but could not see whether either man had a weapon. Another Rider, Andres Cordova, ran toward Cordero and Diaz and began striking Diaz with clenched fists. Then, another Rider, Michael Kons, ran toward the fight and struck Diaz. Officer Garcia broke up the fight by throwing multiple pepper spray grenades. Diaz, Cordero, Cordova, and Kons were handcuffed after assuming the prone position.

Officer Anthony Arisco responded to the fight. He observed Diaz was covered in blood and receiving medical attention. Cordova, Kons, and Cordero were prone on the ground and restrained in handcuffs. Officer Arisco observed a wooden knife beneath Cordova. No other weapons were found.

A nurse treated each of the men for injuries. Diaz suffered four puncture wounds on his back, his shoulder blades, and at the base of his skull. Cordero suffered three puncture wounds at the top of his spine, below one shoulder blade, and above his waistline. Kons suffered a puncture wound on his left temple. Cordova suffered wounds to his neck, chin, and clavicle. Cordova and Diaz were treated at the hospital in Corcoran.

### H. Postattack communications

On June 3, 2019, inmate Michael Maniscalco called Valencia. Maniscalco told Valencia he was friends with Cordero and Potter, who were "in the hole" because of Diaz. He told Valencia, "So I don't know if you know who the fuck that is but uh but their um they, he told me to tell you to put some fucking

15

money on his books, put some money on the phone, and then uh he told me to tell you that that job that you asked him or something is done. You asked him and [Potter] I guess." Maniscalco also stated, "I mean like they fucking got at somebody and uh fucked him off pretty good so [they're] going to be back here, not [Potter] but [Cordero], he's going to be back here a while."

On June 8, 2019, inmate Decko Bojorquez called Bravo. Bojorquez introduced himself as Potter's cell mate and Vasquez's "little homie." Bojorquez explained that Potter "went to the hole" and that Potter wanted to relay to Vasquez the following message. "That hello it's his son. I can't call myself due to loss of phone, but I got a very important message for him, and others who are part of the Company. . . . He got the message from Chula. Everything went absolutely perfect. Alexis got a ride out of here in a helicopter. [¶] . . . [¶] Ok, tell him I love him, and I'll always make him proud. And he'll call when he gets out [of] the hole."

Chavez opined that Bojorquez's reference to a "helicopter ride" out of Corcoran meant the victim was transported off the facility via helicopter due to suffering life threatening injuries.

On June 8, 2019, Bojorquez called Valencia. Bojorquez said he had just spoken to Bravo and had let her know "what happened to that fool Alexis and shit. That fool had a helicopter ride out of here and shit."

On June 11, 2019, Bravo sent a text message, stating, "Alexa has been moved with extreme V." Chavez opined that "extreme V" meant extreme violence.

On June 26, 2019, Vasquez called Bravo. The following exchange took place:

16

"[Vasquez]: Ok so look it, where's where's, did old girl, does old girl still work at the club or no?

"[Bravo]: No, ok so for him supposedly having a contact or whatever, in the movie nothing happened in that scene. It wasn't until Alice contacted somebody to get it going and then literally the next day, she was gone.

"[Vasquez]: Oh ok. On her own?

"[Bravo]: Um no, no.

"[Vasquez]: Ok, ok.

"[Bravo]: Um the son, the son told Alice like hey I'm always, just tell my dad I'm always going to make him proud, and it was with uh you know extreme, extreme V.

"[Vasquez]: Ok absolutely, absolutely.

"[Bravo]: Yeah, Yeah.

"[Vasquez]: That's awesome, ok that's awesome."

On August 17, 2019, Potter called Valencia and asked if she spoke with Vasquez. When Valencia indicated she had not, Potter said, "[J]ust let him know that guy is taken care of. That old boy got flighted out in [a] helicopter ok."

## II. Defense evidence

Vasquez's alleged coconspirator Kons testified for the defense. Kons joined the Riders in 2015 and was housed at Corcoran at the time Diaz was attacked.

Kons explained that he was Vasquez's codefendant and awaiting trial.

Kons testified that he did not intend to kill Diaz or do anything else to Diaz when he arrived at Corcoran. On the date of the attack, Kons saw Cordero fighting with Diaz from across the yard. He ran towards the fight to assist Cordero, who appeared to be losing and had blood on his shirt. He did not see

17

any weapons, however, it looked like Diaz was stabbing Cordero. Kons joined the fight to save Cordero's life and punched Diaz, dropping Diaz to the ground. Kons hit Diaz as Diaz fell to the ground and then kicked him in the leg. Kons backed away from Diaz and laid on the ground after correctional officers threw pepper spray grenades to break up the fight. After the fight, Kons realized that Diaz stabbed him three times.

He explained that a "Playboy Committee" is a meeting where Riders discuss business. Each member has a right to vote at the meeting. He said the Riders never discussed Diaz at a meeting. However, he testified that the Riders do not like splinter groups, and an inmate who tattoos himself with a splinter faction's tattoo could be met with extreme violence.

## III. Jury verdict and sentencing

A jury convicted Vasquez of both counts and found the gang and prison allegations true. In a bifurcated proceeding, the trial court found the prior conviction allegations true.

The trial court sentenced Vasquez to a total term of 15 years plus 50 years to life. On count 1, the trial court sentenced Vasquez to 15 years plus 50 years to life, imposing 25 years to life on the conviction, doubled for a prior strike, plus 10 years for the gang enhancement and an additional 5 years for a prior conviction. On count 2, the trial court sentenced Vasquez to 30 years to life, which was stayed.

Vasquez appealed.

## DISCUSSION

## I. Evidentiary objections

Vasquez raises numerous challenges to the testimony offered by Chavez and Gonzales. While most of these challenges are forfeited as Vasquez's trial counsel did not object below, we

address the merits of each claim as Vasquez has also asserted an ineffective assistance of counsel claim based on the failure to object.  We address each challenge in turn.

### A.    Chavez

#### 1.    Chavez's testimony about progressive gang discipline and the need to kill a founder of a splinter faction

Vasquez argues Chavez's testimony about the Riders' system of progressive discipline should have been excluded under Evidence Code section 352 as its probative value was substantially outweighed by undue prejudice.

We review a trial court's rulings under Evidence Code sections 352 for abuse of discretion.  (*People v. Parker* (2022) 13 Cal.5th 1, 39 (*Parker*).)

Vasquez's trial counsel did not object on Evidence Code section 352 grounds.  Rather, he objected on hearsay grounds and argued that the hypothetical posed by the prosecutor too closely resembled the facts of this case.  Therefore, his Evidence Code section 352 objection is forfeited.  (*People v. Boyette* (2002) 29 Cal.4th 381, 424 (*Boyette*); Evid. Code, § 353, subd. (a).)

However, even if the argument was preserved, the testimony was admissible under Evidence Code section 352.  Chavez's testimony was relevant to the prosecution's theory of motive and intent, as it supported the inference that Vasquez targeted Diaz for murder and not merely assault.  Chavez explained that forming a splinter faction was the most serious violation of the gang's rules, and therefore would warrant the most serious punishment the gang could impose, murder.

Nor was the evidence's probative value substantially outweighed by undue prejudice.  Vasquez argues the evidence

19

was prejudicial as it conveyed the message that the Riders are an extremely violent gang, whose members routinely resort to murder. This was not Chavez's testimony. Rather, Chavez explained the Riders use a system of progressive discipline, reserving assault with weapons and murder only for the most serious offenses, such as forming a splinter faction that challenged the gang's leadership. Thus, the relevance of his testimony was not outweighed by any purported prejudice.

Relatedly, Vasquez argues the trial court should have excluded Chavez's testimony about internal gang discipline as speculative, specifically, his opinion the formation of a splinter faction threatens the gang as the leader of the splinter faction could potentially recruit the gang's members. Vasquez argues this testimony was speculative because there was no evidence Diaz was recruiting from the Riders.

Again, Vasquez's trial counsel did not object on these grounds. Therefore, the argument is forfeited. (*Boyette*, *supra*, 29 Cal.4th at p. 424; Evid. Code, § 353, subd. (a).)

However, even if the objection was preserved, the testimony was not speculative. Chavez's opinion was based on his experience and training in working with prison gangs, and his knowledge of the Riders. He was therefore qualified to offer an opinion on the potential consequences of forming a splinter faction and how it could weaken the gang. Further, there was evidence that Diaz formed the Nuestra Cosas by joining with other Riders. There was also evidence that Diaz created a split within the Riders and Vasquez was concerned Diaz could undermine the Riders. For example, in the Epistle, Vasquez stated: "The infestation of imposters running around like a bunch of lowlife, lawless hooligans were practicing and promoting

20

false propaganda.  They were convincing the imposters to believe—to believe we're the Northern Riders.  Yet, [were] just some made-up gibberish that was falsely fabricated and filtered by [the] lawless little homosexual snitch named Alexander Diaz."  The Epistle further states:  "[T]here is no such thing as Team Snoop, Team Scrappy.  That's some childish nonsense that little faggot snitch Scrappy made up cause he thinks it's cute.  There is nothing cute nor funny about THE RIDER MOVEMENT!"  Chavez's experience and training and the evidence presented shows his testimony was not speculative.

Vasquez also argues that Chavez's opinion was not based on the evidence since the Riders were confined to the SNY at Corcoran; therefore, once Diaz was removed from the SNY, he could no longer recruit members away from the Riders.  Vasquez's argument is not well taken.  The record shows that there were hundreds of Riders, who were housed in multiple facilities within the CDCR system, and that there were multiple SNY's.

> ###      2.      Chavez's opinion on the phone call
> ###           between Bravo and Vasquez

Vasquez argues the trial court should have excluded Chavez's interpretation of the June 26, 2019 phone call between Vasquez and Bravo as unreliable or based on insupportable reasoning under *People v. Stamps* (2016) 3 Cal.App.5th 988 (*Stamps*).

We review the admission of expert testimony for abuse of discretion.  (*People v. Lindberg* (2008) 45 Cal.4th 1, 45 (*Lindberg*).)

21

Vasquez did not object to Chavez's testimony on the grounds he argues on appeal; therefore, his argument is forfeited. (*Boyette*, *supra*, 29 Cal.4th at p. 424; Evid. Code, § 353, subd. (a).)

However, even if we were to consider the argument preserved, we disagree with Vasquez.  In *Stamps*, the defendant was convicted of possession of drugs in pill form.  At trial, the criminalist opined that the pills contained controlled substances by visually comparing their appearance to pills on the Internet. (*Stamps*, *supra*, 3 Cal.App.5th at p. 991.)  *Stamps* explained trial courts have broad discretion to determine whether particular facts to which an expert was prepared to testify are sufficiently " 'reliable,' " and must act as gatekeepers in excluding "expert testimony when necessary to prevent unreliable evidence and insupportable reasoning from coming before the jury."  (*Id.* at p. 994.)  The *Stamps* court concluded that, by admitting the criminalist's testimony that the pills found on the Internet " 'match[ed]' the pill found in Stamp's possession, the [trial] court allowed [the expert] to place case-specific non-expert opinion before the jury, with the near certainty that the jury would rely on the underlying hearsay as direct proof of the chemical composition of the pills."  (*Id.* at p. 992, fn. 2.)

We find *Stamps* inapposite.  Chavez did not rely on any hearsay facts in interpreting the call between Vasquez and Bravo.  Chavez explained, based on his background, training and experience as a gang investigator, and his investigation of the Riders in particular, that Bravo and Vasquez were speaking in code.  He based his interpretation on the evidence presented, including the sequence of events before and after the attack on Diaz.  Nor was Chavez's opinion based on insupportable reasoning.  Indeed, the content of the call itself only makes sense

22

if Bravo and Vasquez were speaking in some kind of code. Therefore, Chavez's opinion was reasoned and reliable.

### 3. Chavez's testimony characterizing the attack as an "attempted murder"

Vasquez argues the trial court should have prevented Chavez from describing the attack on Diaz as an "attempted murder" because it presented a legal conclusion and supplanted the role of the jury. We disagree.

As stated above, we review an expert's opinion for abuse of discretion. (*Lindberg*, *supra*, 45 Cal.4th at p. 45.)

We find no abuse of discretion here. As the investigating officer, Chavez's references to the attempted murder were in reference to the crime he was tasked with investigating and the charges in this case. The trial court correctly noted Chavez's characterization of the crime he was investigating had no bearing on whether it was true or not. Nor was Chavez's testimony likely to mislead the jury into believing Vasquez's conviction for attempted murder was a foregone conclusion, eliminating the need for deliberation or relieving the prosecution of its burden to prove each element of the offense beyond a reasonable doubt. Indeed, the parties' closing arguments demonstrate that whether Vasquez acted with an intent to kill Diaz rather than just assault him was vigorously contested based on the evidence.

### 4. Chavez's interpretation of Bravo's statement that Diaz could "finally be at peace"

Vasquez argues the trial court should have excluded Chavez's testimony interpreting a text message between Bravo and Simmons where Bravo states: "This book is a real thriller, but it looks like what I predicted about the next chapter was

23

right on. That girl is in the perfect place to get a hug and finally be at peace." Chavez opined the phrase "finally be at peace" was code for "someone who is dead or died." Vasquez asserts that there was nothing in this message that related in any way to Chavez's expertise as a gang investigator.

Again, Vasquez's counsel did not object to this testimony on the grounds he argues here. Therefore, the argument is forfeited. (*Boyette*, *supra*, 29 Cal.4th at p. 424; Evid. Code, § 353, subd. (a).)

However, even if we were to consider the objection preserved, there was no abuse of discretion. (*Lindberg*, *supra*, 45 Cal.4th at p. 45.) Vasquez cites *People v. Hernandez* (1977) 70 Cal.App.3d 271 (*Hernandez*) as support for his argument that Chavez's testimony was unrelated to his expertise. In *Hernandez*, the court found an abuse of discretion in admitting a police officer's opinion that defendant's shaking his head from side to side meant he had been asked if he had any more narcotics and had responded that he did not. (*Id.* at pp. 274– 275.) The *Hernandez* court held the officer's expertise did not add any probative value to the evidence, which the jury could interpret for itself. (*Id.* at p. 281.)

*Hernandez* is distinguishable. While the phrase "finally be at peace" could be understood by a layperson as referring to someone who has died, the phrase appeared in a text message where the participants were speaking in code. The full message read: "This book is a real thriller, but it looks like what I predicted about the next chapter was right on. That girl is in the perfect place to get a hug and finally be at peace." Chavez's testimony assisted the jury in interpreting the coded message and was based on his background, training, and experience as a gang investigator, which included interpreting messages between

24

gang members and their facilitators. Thus, Chavez's interpretation related to his expertise as a gang investigator.

### B. Terry Gonzales

#### 1. Whether Gonzales's testimony regarding the attack on Diaz was speculative

Vasquez argues Gonzales's testimony regarding the attack on Diaz in 2019 was speculative since Gonzales left the Riders in 2017. Vasquez challenges Gonzales's testimony that, "I'm testifying today because it's the right thing to do. My life was attempted to be taken from me, and it's my belief that Mr. Vasquez is out of control . . . . [¶] . . . [¶] with his attempt at murder and mayhem and extortion. [¶] So I feel that I have evidence and information as a fellow member—a ranking member of the gang and a close partner of his to stop that mayhem, attempted murder, and assault." Vasquez also challenges Gonzales's testimony that Vasquez had put out a "kill order" for Diaz that was still in effect in 2019.

Vasquez did not object on the grounds that Gonzales's testimony was speculative; therefore, his argument is forfeited. (*Boyette, supra*, 29 Cal.4th at p. 424; Evid. Code, § 353, subd. (a).)

However, even if we were to consider the objection preserved, Gonzales's testimony was not speculative. Gonzales knew why he was testifying and the trial court explained to the jury that Gonzales's testimony could be considered for the purpose of showing Gonzales's state of mind. Second, with respect to Gonzales's knowledge of the "kill order," there was evidence that Vasquez ordered Gonzales to kill Diaz while Gonzales was still a member of the Riders. Whether the kill order was still in place after Gonzales left the gang went to the weight of the testimony, as Gonzales indicated that he still

25

communicated with Vasquez even after he left the gang. Therefore, Gonzales's testimony was not speculative.

## 2. Gonzales's testimony regarding how he was the victim of an attack ordered by Vasquez

Vasquez argues the trial court should have excluded Gonzales's testimony that he was stabbed 25 times by two assailants on Vasquez's orders under Evidence Code section 352. We disagree.

As stated above, we review the trial court's rulings under Evidence Code sections 352 for abuse of discretion. (*Parker, supra,* 13 Cal.5th at p. 39.)

We find no abuse of discretion as the testimony's probative value was not outweighed by undue prejudice. As the trial court correctly recognized, Gonzales's testimony was relevant to his credibility and reasons for testifying. "Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible." (*People v. Burgener* (2003) 29 Cal.4th 833, 869.) The fact that he had been attacked by the Riders was also relevant to his motivation to testify against Vasquez. (See *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1368–1369.) "A witness who testifies despite fear of recrimination of *any* kind by *anyone* is more credible because of his or her personal stake in the testimony." (*Ibid.*)

Further, the evidence was relevant to how the gang worked and its system of progressive discipline, specifically, to show how a serious violation of the gang's rules would result in violent retribution, including murder. Gonzales testified that Vasquez told him he was attacked because he was disloyal and was a

26

snitch.  This evidence was highly relevant to prove Vasquez's intent to kill Diaz under Evidence Code 1101, subdivision (b), which permits evidence of prior wrongdoing if relevant to prove motive or intent.  Additionally, some of the details of the attack, including Gonzales's injuries, were relevant to show that Gonzales's transgressions were serious enough to warrant a violent assault with weapons.  Thus, although the evidence was prejudicial, it was relevant and highly probative of Vasquez's intent, which was a central issue at trial.  (*People v. Zapien* (1993) 4 Cal.4th 929, 958.)

### 3. Evidence that Gonzales tried to stab Diaz while acting under Vasquez's orders

Vasquez argues the trial court should have excluded Gonzales's testimony that Vasquez ordered him to kill Diaz via kites and letters.  Specifically, Vasquez argues the trial court abused its discretion in purportedly issuing contradictory rulings that precluded such testimony, but then allowed Gonzales to testify about two purported attempts on Diaz's life on Vasquez's orders.  We find no abuse of discretion.

When Gonzales's testimony regarding the orders to kill Diaz was first discussed, defense counsel objected on grounds of relevance and prejudice.  The trial court noted that it was admissible under Evidence Code section 1101, subdivision (b).  The prosecutor stated the evidence was not being offered under Evidence Code section 1101, subdivision (b), but to show how the gang conducts its business.  When the testimony was discussed again, the trial court again stated the evidence was admissible under Evidence Code section 1101, subdivision (b).  The trial court later confirmed that Vasquez's motion to exclude Gonzales's testimony had been denied.

27

We note to the extent the trial court's rulings were ambiguous, Vasquez's trial counsel was obligated to ask for clarification after the trial court ruled Gonzales's testimony was admissible. (*People v. Ramirez* (2006) 39 Cal.4th 398, 472–473.) Further, as the trial court correctly ruled, the evidence was relevant and admissible under Evidence Code section 1101, subdivision (b) to show Vasquez's motive and intent. Evidence that Vasquez had previously ordered Diaz's murder was highly relevant to prove that Vasquez wanted Diaz killed as opposed to just assaulted.

### C.      Chavez's and Gonzales's testimonies regarding the "hit list"

Vasquez argues the trial court erred when it allowed Chavez and Gonzales to testify regarding the Riders "hit list." Specifically, Vasquez argues the admission of the list violated the trial court's order granting his motion to exclude any evidence that Vasquez conspired to murder any other person. Further, Vasquez argues Chavez and Gonzales improperly relied on case-specific hearsay in violation of *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).

Before opening statements, Vasquez requested that the prosecutor not refer to the list of names found in Vasquez's cell as a "hit list" before establishing a proper foundation. The trial court granted that request. Later, when the trial court was discussing juror exhibit binders, it reiterated its ruling that the prosecutor could not call the list of names a "hit list" until laying a foundation.

During trial, Chavez was asked about the list. He testified that the list contained the names of Nuestra Cosas members, including their monikers, inmate identification numbers, street

28

gang membership, and the area of California where each member was from.  Chavez then opined the list contained the names of inmates who had been targeted for assault or murder at the direction of the Riders' leadership.  Chavez further testified that generally gangs will maintain lists of rival gang members in order to pass that information to other members of the gang.

When Gonzales was asked about the list, he testified that it was a Riders "hit list" and that it was formatted in a manner approved by Vasquez.  Gonzales explained that sometimes similar lists will be labeled a "hit list" although the one presented was not labeled as such.

Again, Vasquez did not object that the testimony regarding the list violated the trial court's ruling excluding evidence that he conspired to murder any other person or on *Sanchez* grounds.  Therefore, his arguments are forfeited.  (*Boyette*, *supra*, 29 Cal.4th at p. 424; Evid. Code, § 353, subd. (a).)

However, even if the objections had been preserved, there was no abuse of discretion.  Under *Sanchez*, "If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay.  Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception.  Alternatively, the evidence can be admitted through an appropriate witness and the expert may assume its truth in a properly worded hypothetical question in the traditional manner."  (*Sanchez*, *supra*, 63 Cal.4th at p. 684.)

Here, the list was offered for the nonhearsay purpose to show Vasquez's state of mind.  The relevance of the list was that Vasquez possessed a list of names of members of a rival gang.  It was not offered for the purpose of its truth, i.e., that Vasquez

29

had targeted the individuals for murder. Thus, because the list was relevant to Vasquez's state of mind, it did not constitute hearsay. Moreover, the list was admitted into evidence and the jury was able to evaluate it on its own. (See *Sanchez*, *supra*, 63 Cal.4th at p. 684.)

We are also not persuaded that the admission of the list violated the trial court's order generally excluding any evidence that Vasquez conspired to kill any other person. When the trial court first addressed whether evidence of other murder conspiracies would be permitted, it had already ruled that the list was admissible, and that it could be called a "hit list" after the prosecution laid a proper foundation. Thus, it appears the trial court's more general order precluding any evidence Vasquez conspired to murder others did not apply to the prosecutor's specific request to admit the list for a nonhearsay purpose to show Vasquez's state of mind.

## II. Prosecutorial misconduct

Vasquez also argues his convictions should be reversed on the grounds of numerous instances of prosecutorial misconduct. Like Vasquez's evidentiary challenges, his trial counsel did not object on the grounds he now asserts on appeal. Therefore, his arguments are mostly forfeited. To the extent his arguments are preserved, we find them unpersuasive or the errors harmless.

### A. The prosecutor eliciting testimony that Vasquez ordered Gonzales to kill X-Raided

Vasquez argues the prosecutor committed misconduct by eliciting testimony from Gonzales that Vasquez ordered him to kill the inmate X-Raided. Vasquez asserts the prosecutor intentionally asked Gonzales questions regarding the attack on X-Raided despite the trial court's order granting Vasquez's

30

motion to exclude any evidence or testimony that Vasquez conspired to murder any other person.

### 1. Additional background

Vasquez filed a motion in limine containing multiple requests to both preclude and introduce evidence. As previously stated, Vasquez sought to exclude any "evidence or testimony" that he "conspired to murder any other person." The trial court granted this request after the prosecutor stated there would be no evidence offered under Evidence Code section 1101, subdivision (b). Nevertheless, Vasquez sought to introduce evidence that Gonzales "received a 'kite' from [Vasquez] who ordered him to kill a rapper inmate named 'X-Raided.' " The trial court granted Vasquez's motion to introduce this evidence.

During Gonzales's testimony, the prosecutor asked him, "In the course of your work with the Northern Riders, one of the plans you carried out was actually against a rapper . . . X-Raided; is that correct?" Vasquez's trial counsel objected to the question as leading, which was sustained. The prosecutor asked, "Did you carry out an attack against a rapper that went by the name of X-Raided?" Again, Vasquez objected the question was leading, which the trial court overruled. Gonzales answered that he did carry out the attack at the direction of Vasquez. After the prosecutor asked several more questions, Vasquez's trial counsel objected under Evidence Code 1101, subdivision (b). The trial court held a sidebar conference and sustained the objection, relying on the prosecutor's representation that this evidence would not be offered under Evidence Code section 1101, subdivision (b). Although the trial court noted the testimony would have been properly admitted under Evidence Code section 1101, subdivision (b), it sustained the objection because

31

the prosecutor's prior representation deprived Vasquez's trial counsel of adequate time to prepare. "Had you asked to do that, I probably would have let you do it because it's very on point. But you agreed not to; so I didn't have to make a ruling, and you just have to abide by your position unless you want to change it. If you don't, that's fine. I'll just strike anything regarding the stabbing of X-Raided." The trial court then admonished the jury "to disregard all the testimony regarding the attack of X-Raided . . . . You are to strike that and disregard it for the purposes of this trial."

### 2.      Standard of review and governing law

"It is misconduct for a prosecutor to violate a court ruling by eliciting or attempting to elicit inadmissible evidence in violation of a court order." (*People v. Crew* (2003) 31 Cal.4th 822, 839.) "Because we consider the effect of the prosecutor's action on the defendant, a determination of bad faith or wrongful intent by the prosecutor is not required for a finding of prosecutorial misconduct. [Citation.] A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." (*Ibid.*)

### 3.      Analysis

We find no misconduct here. Although the trial court granted Vasquez's motion in limine to exclude any evidence that Vasquez conspired to murder any other person, it also granted his motion to introduce evidence that Gonzales received a message from Vasquez with an order to kill X-Raided. Under these circumstances, it was reasonable for the prosecutor to assume the more specific ruling, that allowed Gonzales's testimony that he received a note from Vasquez to attack X-

32

Raided, controlled over the more general ruling that excluded any evidence or testimony that Vasquez conspired to murder any other person.  Moreover, the trial court promptly admonished the jury and struck the testimony.  "[W]e may presume that jurors can follow such an admonition." (*People v. Miller* (2009) 175 Cal.App.4th 1109, 1117.)

Further, while bad faith is not required to find instances of prosecutorial misconduct, a defendant must still show he suffered prejudice.  "Error with respect to prosecutorial misconduct is evaluated under *Chapman v. California* (1967) 386 U.S. 18 . . . to the extent federal constitutional rights are implicated and *People v. Watson* (1956) 46 Cal.2d 818 . . . if only state law issues were involved." (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 564.)  Under *Chapman*, prosecutorial misconduct that violates federal law is not prejudicial if the misconduct was harmless beyond a reasonable doubt. (*People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1268–1269.)  Under *Watson*, prosecutorial misconduct that violates state law is not prejudicial " 'unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' " (*People v. Flores* (2020) 9 Cal.5th 371, 403.)

Here, even under the more rigorous *Chapman* standard, any misconduct was harmless beyond a reasonable doubt.  The testimony regarding X-Raided was brief and the trial court immediately sustained Vasquez's trial counsel's objection, admonished the jury, and struck the testimony.  Further, the evidence that Vasquez conspired to murder Diaz was overwhelming given the numerous recorded phone calls, the text message exchanges, the documents found in Vasquez's cell, the

experts' testimony, and the nature of the attack. Therefore, any error was harmless.

### B. The prosecution's failure to accurately describe the attack on Gonzales

Vasquez argues the prosecutor committed misconduct by failing to fully and accurately describe the attack on Gonzales during the discussions with the trial court regarding the testimony's admissibility. We disagree.

### 1. Additional background

In its initial discussion with the prosecutor regarding the admissibility of Gonzales's anticipated testimony that he had been attacked by the Riders, the prosecutor relayed to the trial court that he expected Gonzales to testify that "he was a victim of an attack—he was stabbed several times—and that at least one of the attackers yelled out 'Northern Riders' afterwards." In relation to that testimony, Vasquez's trial counsel sought to exclude any evidence that Vasquez ordered the attack on Gonzales. The trial court granted Vasquez's request, and the prosecutor agreed not to elicit any testimony from Gonzales that Vasquez ordered the attack.

Later, in discussing Gonzales's anticipated testimony regarding the attack, the prosecutor relayed to the trial court that Gonzales told him during a recent interview that Vasquez wanted Gonzales killed. The trial court revisited its prior ruling and agreed with the prosecutor that Gonzales's testimony was relevant to his credibility in addition to how the gang worked. In discussing the details of the attack, the prosecutor sought to admit the nature of the attack, specifically, that Gonzales "suffered several slash and stab wounds to his face and to his eyes." The trial court noted that it had previously ruled the

34

details of the attack would be excluded, but stated the prosecutor could elicit testimony that when "they effectuate these attacks, they can be extremely violent, and then he can say, 'In my case, I had these injuries,' " but not that " 'they wanted to kill me.' " The trial court stated, "[Y]ou can ask him . . . when there's a power struggle like that, are there various levels . . . of discipline. It can go from a very low level at a talking-to to murder. And in his case, it was a power struggle not within but with the president. So in his case, he can say, 'I had cut and slashes and cuts all over my face, around my eyes, and stab wounds.' "

Gonzales testified he was stabbed 25 times all over his body.

### 3. Analysis

Vasquez's trial counsel did not object or alert the trial court to any material representations made by the prosecutor regarding the nature of the attack on Gonzales. Failure to raise the issue of prosecutorial misconduct at trial forfeits the right to appellate review of that issue. (*People v. Thomas* (2011) 51 Cal.4th 449, 491–492; *People v. Lopez* (2008) 42 Cal.4th 960, 966). Therefore, the argument is forfeited.

However, even if the argument had been preserved, we would not find the prosecutor made any misrepresentation here. We note it is unclear whether the prosecutor had the opportunity to interview Gonzales before representing to the trial court that Gonzales was stabbed several times. Rather, it appears the investigators were relaying to the prosecutor what Gonzales had told them. However, it is clear that, after the prosecutor had the opportunity to speak to Gonzales directly, he made the trial court and Vasquez's trial counsel aware of the violent nature of the attack. This is reflected in the additional discussions about the

35

attack before Gonzales testified.  During those discussions, the trial court specified that Gonzales was permitted to testify that he had " 'slashes and cuts all over [his] face, around [his] eyes, and stab wounds,' or whatever he had."  Further, in that same discussion, the prosecutor described the attack in detail, and it is apparent that Vasquez's trial counsel was concerned about the details of the violent nature of the attack.  Given the state of the record, we conclude the prosecutor did not misrepresent the nature of the attack on Gonzales.

C.     **Whether the prosecutor argued facts not in evidence**

Vasquez argues the prosecution committed multiple acts of misconduct by arguing facts not in evidence.  These include the prosecution's statement that "nobody got charged out in Corcoran," that Diaz was stabbed in the "kill spot," that Diaz was attacked because he was recruiting members of the Riders, and that Gonzales was attacked because he left the Riders.  We conclude the prosecutor's arguments were fair comments on the evidence and, to the extent the prosecutor argued facts not in evidence, any error was harmless.

A prosecutor has wide latitude in his closing argument, and is allowed to make fair comments on the evidence, including reasonable inferences or deductions.  (*People v. Jackson* (2016) 1 Cal.5th 269, 349.)  A prosecutor may "argue all reasonable inferences from the record, and has a broad range within which to argue the facts and the law."  (*People v. Daggett* (1990) 225 Cal.App.3d 751, 757.)

36

### 1. Whether other individuals were charged in Corcoran

In closing argument, Vasquez's counsel challenged Gonzales's credibility by noting that Gonzales committed numerous crimes while in prison and had never been prosecuted. During rebuttal argument, the prosecutor argued: "There's no question that [Gonzales] . . . has gotten away with a lot of crime, a lot of attacks. That's not what you're here for, though. You're here for Maurice Vasquez. What we're asking you to do is to hold Maurice Vasquez accountable. [¶] We have the evidence in this case through good investigation. Even though the crime happened out of Corcoran, even though nobody got charged out in Corcoran, we have the evidence . . . and that's why we're asking you to convict."

In reviewing the record, it appears the prosecutor's comments were purely geographical in describing Vasquez to the jury as the only individual to be charged outside of Corcoran. Indeed, the jury was well aware that Kons participated in the attack while at Corcoran and had also been charged with the conspiracy to murder Diaz. Indeed, during his testimony, Kons stated he had been charged similarly in this case, was Vasquez's codefendant, and was awaiting trial. Further, in addressing Kons's testimony regarding the attack, the prosecutor argued to the jury it did not have to decide what Kons did or did not do as Kons would have "his own trial," "his own evidence," and "his own jury." Thus, the prosecutor's comments were not likely to be interpreted in an impermissible manner or that the jury should hold Vasquez accountable because Diaz's direct attackers had not been charged.

## 2. Whether Diaz was attacked because he was recruiting Riders to his splinter faction

During closing argument, the prosecutor argued Vasquez was motivated to kill Diaz because he was recruiting Riders to the Nuestra Cosas. The prosecutor stated: "I want to look at the [timeline] for a second. Vasquez found[ed] the gang in 1999. Diaz joins in the early 2000's. He's there for a while. After about 2015, he decides to break off. He forms the Nuestra Compas, which becomes Nuestra Cosas, and he starts recruiting. That is what got him his death sentence right there because Vasquez hates leadership challenges."

Vasquez has forfeited his claim that the prosecutor argued facts not in evidence as his trial counsel did not object or request an admonition that would have cured any prejudice. (*People v. Bennett* (2009) 45 Cal.4th 577, 616 (*Bennett*).)

However, even if Vasquez's argument was not forfeited, the prosecutor's argument was a fair comment on the evidence. There was evidence that Diaz founded the Nuestra Cosas with other Riders. There was also evidence that Diaz created a split within the Riders, and that Vasquez was concerned over Diaz's influence over other Riders as shown by Vasquez's statements in the Epistle, where he describes Diaz as a "lawless little homosexual snitch" who was convincing other Riders to "believe" they were in the gang and "promoting false propaganda." The Epistle further states: "[T]here is no such thing as Team Snoop, Team Scrappy. That's some childish nonsense that little faggot snitch Scrappy made up cause he thinks it sounds cute. There is nothing cute nor funny about THE RIDER MOVEMENT!"

38

Given the record, the prosecutor's argument that Vasquez wanted Diaz killed because he was recruiting Riders to the Nuestra Cosas was a fair comment on the evidence.

### 3. Whether Diaz was stabbed in the "kill spot"

Vasquez asserts that the prosecutor relied on facts not in evidence when he argued that Vasquez acted with an intent to kill because Diaz was stabbed in the "kill spot."

During closing argument, when arguing Diaz's attackers acted with an intent to kill, the prosecutor stated: "[R]emember what Terry Gonzale[s] told us about Vasquez's training. You have to look at vital parts around the head, under the arms, the lungs. . . . [¶] This is the medical report that shows Mr. Diaz was stabbed in the back of the neck just below the skull, just like Terry Gonzale[s] explained to us; in the center of the spine; on the right[ ] side of the back—it looks like kind of near the shoulder blade—and on top of the left shoulder; puncture wounds; active bleeding." In arguing Vasquez was guilty of attempted murder rather than assault, the prosecutor later argued, "I put together some examples of how we know what intent is. Sometimes people think we can't know what's in someone's mind unless they scream out 'I'm going to kill you' at the moment they swing the knife. That's not necessary. Intent we typically infer from other things, from other evidence. Here, they stabbed Diaz in the kill spot: Beneath the skull. Beneath the skull, in the spine."

Vasquez has forfeited his claim that the prosecutor argued facts not in evidence as his trial counsel did not object or request an admonition that would have cured any prejudice. (*Bennett*, *supra*, 45 Cal.4th at p. 616.)

39

However, even if Vasquez preserved the argument, the prosecutor's argument was a fair comment on the evidence. Gonzales testified that he trained other Riders at Vasquez's direction to stab targeted inmates in the vital areas of the body, including the jugular and carotid artery, i.e., the neck. Further, the nurse who treated Diaz's injuries testified that Diaz suffered stab wounds to his spine and base of his skull. It was therefore a reasonable inference that the location of Diaz's wounds evidenced an intent to kill, i.e., that Diaz was stabbed in an area of his body that could have resulted in his death or the "kill spot."

### 4. The prosecutor's suggestion that Gonzales was attacked because he left the gang

Vasquez contends the prosecutor argued facts not in evidence when he stated Gonzales was stabbed because he tried to leave the Riders. We agree this statement was unsupported by the record; however, we conclude any error was harmless.

During closing argument, the prosecutor stated Gonzales was attacked because he left the gang. This statement provided support for the prosecutor's argument that Vasquez acted with the intent to kill in this case because Gonzales was subject to similar violent retribution for going against the gang. The prosecutor argued: "Also, think about [Gonzales]. He definitely did not seem like a good person, but he seemed credible. It seemed like he was actually answering questions and not trying to avoid them from both the prosecution and the defense. This guy was stabbed 25 times for trying to leave the gang. 25 times. He was just trying to leave. That's not even close to as bad as what Diaz did. Diaz tried to break somebody off. Diaz tried to recruit people away. [Gonzales] was just taking himself away, and he got stabbed 25 times for that. He didn't even form a

40

faction. [¶] In one of those documents—I think it was the handwritten Missive—there's this example from KVSP where some guy got tattoos of their little subgroups, and they were given an order to take them off or they would be cut off. That's just a tattoo. Diaz is recruiting Northern Riders away from Vasquez, the worst thing you can do. That's why he gets the worst order you can get."

In contrast, when Gonzales testified regarding the reasons for the attack, he said that Vasquez told him the attack was carried out because Gonzales was "disloyal in [his] failure to kill Alexander Diaz, and that [he] was a snitch." Thus, we agree with Vasquez that the prosecutor argued facts not in evidence.

Nevertheless, we find any error harmless. "When the issue 'focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Harrison* (2005) 35 Cal.4th 208, 244.) " 'A defendant's conviction will not be reversed for prosecutorial misconduct . . . unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' " (*Ibid*.)

Here, the record shows the prosecutor was using Gonzales's testimony regarding the attack to illustrate how the gang's system of progressive discipline worked, and to show that Vasquez's intent was to kill Diaz rather than merely assault him due to the gravity of Diaz's offense against the gang in forming a splinter faction. However, rather than arguing Gonzales was attacked because he was disloyal and because he was a snitch, which was Gonzales's testimony, the prosecutor argued Gonzales was the victim of an attempted murder because he left the gang.

41

While the prosecutor incorrectly described the facts, the record provided that Gonzales was violently attacked for being disloyal to the gang and for cooperating with law enforcement—both of which the jury could reasonably infer were violations serious enough to warrant a comparable punishment to Diaz. Because the evidence was sufficiently analogous and the jury was not asked to consider the evidence for an improper purpose, it is not reasonably probable a result more favorable to Vasquez would have been reached had the prosecutor argued Gonzales was attacked because he was disloyal and a snitch.

### D. Whether the prosecutor urged the jury to consider evidence of the attack on Gonzales for an improper purpose

Vasquez argues the prosecutor asked the jury to consider evidence of Gonzales's attack for an improper purpose. Specifically, Vasquez asserts that the prosecutor urged the jury to consider the attack as evidence of Vasquez's character or his propensity for violence in violation of Evidence Code section 1101, subdivision (a).

Vasquez did not object to this argument or request a curative admonition. Therefore, the argument is forfeited. (*People v. Powell* (2018) 6 Cal.5th 136, 171.)

However, even if the argument was preserved, it lacks merit. As explained by both the prosecutor and the trial court, the evidence was admissible under Evidence Code section 1101, subdivision (b). Evidence of the attack on Gonzales was relevant to prove Vasquez's intent. The prosecution's theory was that Vasquez targeted individual members of the gang for discipline, and that more serious violations of the gang's rules warranted violent retribution, including murder. Gonzales's testimony

regarding the attack was therefore highly relevant to show the gang's response to perceived transgressions of the gang's rules. Thus, the prosecutor argued to the jury that evidence of the attack should be considered for a proper purpose to show Vasquez's motive and intent, not merely as propensity evidence to prove Vasquez's bad character. Accordingly, there was no error.

### E.     Improper vouching

Vasquez argues the prosecution engaged in misconduct by improperly vouching for witnesses. However, Vasquez has not cited to any specific examples of vouching. Therefore, his argument fails.

"Improper vouching occurs when the prosecutor either (1) suggests that evidence not available to the jury supports the argument, or (2) invokes his or her personal prestige or depth of experience, or the prestige or reputation of the office, in support of the argument." (*People v. Anderson* (2018) 5 Cal.5th 372, 415.) " 'A prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record.' [Citation.] 'However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief," [his] comments cannot be characterized as improper vouching.' " (*People v. Romero and Self* (2015) 62 Cal.4th 1, 39.)

Here, Vasquez has not directed us to any specific examples of vouching; therefore, he has failed to carry his burden on appeal to show error. To the extent Vasquez's brief contains citations to the record, it directs us to the trial court's timely admonishment

of the jury, during which the trial court interrupts the prosecutor's closing argument and instructs the jury that the attorneys could not vouch for witnesses, and instructed the jurors to make their own determinations based on the evidence. To the extent there was improper vouching, the error was harmless as evidence of Vasquez's guilt was strong. This included the numerous recordings, text messages, documentary evidence related to the Riders, and the experts' testimony.

## III. Ineffective assistance of counsel

Vasquez argued he received ineffective assistance of counsel based on his counsel's failure to object to the various claims he argues on appeal.

"Generally, to prevail on a claim of ineffective assistance of counsel, a defendant must show both that his counsel's performance fell below an objective standard of reasonableness and there is a reasonable probability of a more favorable outcome in the absence of the deficient performance. [Citation.] We always start with a presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*People v. Ruiz* (2023) 89 Cal.App.5th 324, 329, citing *Strickland v. Washington* (1984) 466 U.S. 668, 688.) "If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal." (*People v. Kraft* (2000) 23 Cal.4th 978, 1068–1069.)

As discussed at length above, Vasquez's claims of evidentiary error and prosecutorial misconduct were not persuasive. Therefore, Vasquez has not demonstrated deficient performance, and his claims of error lack merit. Moreover,

44

Vasquez's counsel could have had valid tactical reasons for not objecting on the grounds Vasquez now argues on appeal, most likely, because he believed the objections would have been overruled. Accordingly, we reject Vasquez's ineffective assistance claim.

## IV. Cumulative Error

Vasquez argues cumulative error undermined the fundamental fairness of his trial and requires reversal of his conviction. As explained above, to the extent there were any errors, they were harmless.

## V. AB 333

The parties agree that the jury's true finding on the gang enhancement must be remanded as the predicate offenses no longer satisfy the amended requirements under AB 333.

To prove a section 186.22 enhancement, the prosecution must show: (1) the underlying felony must be committed for the benefit of, at the direction of, or in association with any criminal street gang; and (2) the felony must be committed with the specific intent to promote, further, or assist in criminal conduct by gang members. (§ 186.22, subd. (b)(1); *People v. Perez* (2017) 18 Cal.App.5th 598, 606–607.)

Effective January 1, 2022, AB 333 amended the elements for establishing the existence of a "criminal street gang" and "a pattern of criminal gang activity." (Stats. 2021, ch. 699.) It modified the definition of "criminal street gang" to "an ongoing, organized association or group of three or more persons, whether formal or informal," whose members "collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f), as amended by Stats. 2021, ch. 699, § 3.) Under AB 333, a "pattern of criminal gang activity" means "the commission of,

45

attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of, two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed, the offenses were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit from the offenses is more than reputational." (§ 186.22, subd. (e)(1).)

Vasquez's judgment was not final when AB 333 went into effect on January 1, 2022; therefore, its amendments apply to this case. (*People v. Perez* (2022) 78 Cal.App.5th 192, 206.)

Here, both sides agree there was no evidence that the predicate offenses used to establish a pattern of criminal activity were committed for a nonreputational benefit to the Riders. Therefore, the predicate offenses do not meet the requirement that common benefit to the gang was more than reputational under section 186.22, subdivision. (e)(1). Accordingly, the gang enhancement must be vacated. The prosecution may elect to retry the gang enhancement allegations on remand. "When a statutory amendment adds an additional element to an offense, the prosecution must be afforded the opportunity to establish the additional element upon remand." (*People v. Eagle* (2016) 246 Cal.App.4th 275, 280.)

## DISPOSITION

The judgment is affirmed in part and reversed in part. The gang enhancement is reversed and the matter is remanded to the trial court to afford the prosecution an opportunity to retry the gang allegations.


VIRAMONTES, J.


WE CONCUR:


STRATTON, P. J.


WILEY, J.